**In re CORPUS CHRISTI HOTEL PART-NERS, LTD., A Texas Limited Part-nership, Debtor.**

**Bankruptcy No. 89–01757–C–11.**

United States Bankruptcy Court,
S.D. Texas,
Corpus Christi Division.

Jan. 15, 1991.

Ben B. Floyd, Bonham, Carrington & Fox, Houston, Tex., for debtor.

Shelby A. Jordan, Jordan & Shaw, Corpus Christi, Tex., for Corpus Christi Hotel Partners, Ltd. (J.N. Smith, Jim Barnett, G. Bickford Shaw).

Timothy R. Gideon, Austin, Tex., for Franklin Federal Bancorp.

## MEMORANDUM

RICHARD S. SCHMIDT, Bankruptcy Judge.

Currently before the Court is Corpus Christi Hotel Partners, Ltd.'s, Motion to Determine the Extent of Cash Collateral. Prior to filing Chapter 11, Corpus Christi Hotel Partners, Ltd., owned and operated the Embassy Suites Hotel through its management company, Motor Hotel Management, Inc. ("MHM"). Franklin Federal Bancorp, the beneficial holder of a note and deed of trust covering the property, claims an interest in the hotel revenues generated from the operation of the property. This Court has jurisdiction to determine the validity and priority of Franklin Federal Bancorp's interest pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(b), 11 U.S.C. §§ 363 and 552.

## FACTS

Corpus Christi Hotel Partners, Ltd. ("CCHP") filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on November 7, 1989.

Prior to the bankruptcy filing, Franklin Federal Bancorp ("FFB") brought two suits in Travis County State Court against the Debtor to collect rents from the Embassy Suites Hotel (the "Property"), to which FFB claims absolute title, and to revoke the limited license to use rents granted to the Debtor in the deed of trust covering the Property. The October 5, 1989 revocation of the Debtor's license to use rents perfected FFB's interest in those rents pre-petition. On November 13, 1989 FFB filed a

Notice of Perfection of Interest in Rents under 11 U.S.C. § 546(b) requesting that the Debtor segregate the proceeds of FFB's collateral as collected and account to FFB for those proceeds.

On November 21, 1989 the Debtor filed a Motion for Authority to Use Cash Collateral in order to use proceeds from Hotel operations, and subsequently the parties entered into a Cash Collateral Stipulation authorizing the use of cash, but reserving the issues herein.

FFB is the owner and holder of a $10,-881,000.00 promissory note ("Note") dated May 15, 1985, which was executed by the Debtor and made payable to the order of Northwest Savings Association, a Texas savings and loan association ("NSA"). The Note is secured by a deed of trust and security agreement ("Deed of Trust") of even date therewith.[1] FFB is now in the position of Beneficiary under this Deed of Trust.

The Note is further secured by a security interest in all personal property described in the Deed of Trust, by virtue of a financing statement ("Financing Statement")[2] filed with the Texas Secretary of State on September 30, 1985.

The Hotel was operated for the Debtor by Motor Hotel Management, Inc. ("MHM") pursuant to their MHM Management Contract ("Mgt. Contract") which designates the Debtor as "OWNER" and explicitly states that MHM will be employed as the OWNER's agent and general manager for the Hotel. Conversely, Section 2 of the Mgt. Contract specifically appoints MHM with authority to direct, supervise and manage the operation of the Hotel as an independent contractor and not as an agent of OWNER. Section 3(c) prohibits the OWNER from interfering with or giving orders or instructions to Hotel personnel. However, the OWNER did participate to a limited extent in formulating the Hotel's annual budget.

Mgt. Contract § 1(d) provides that all funds known as "Gross Revenue"[3] received by MHM in the operation of the Hotel "shall be funds of the OWNER and shall be deposited by MHM in one or more institutions as designated by the OWNER in the name of MHM as agent and manager of the OWNER." MHM was the only party authorized to withdraw funds from said bank account(s). Funds flowing into the General Operating Account included all revenue from Hotel operations including room charges, bell and maid service, linen and laundry service, valet parking, reservations with affiliated hotels, gift shop, newspaper, telephone service, cable television, restaurant and room service. When checking out, the guest paid one hotel bill which included these services. The Hotel then

---

1. The Deed of Trust and Security Agreement was executed and delivered by Debtor to Fred L. White, Trustee, for the benefit of NSA, and is filed of record at Page 367, *et seq.*, of volume 1997 of the Deed of Trust Records of Nueces County, Texas. It covers the Property described as follows and all personal property located thereon, affixed thereto, or used in connection with, the Property known as the Embassy Suites Hotel ("Hotel"), Lot K, Block 2-a, BYRON WILLIS SUBDIVISION, a subdivision of the City of Corpus Christi, Texas, as shown by the map or plat thereof recorded in Volume 44, Pages 183 and 184, Map Records of Nueces County, Texas.

2. The Financing Statement covers all personal property now owned or hereafter acquired by the Debtor that is located on, attached to, and used in connection with the operation of the Property. Specifically, this includes: ... the proceeds of the Land, including but not limited to ... (f) all deposits (including tenant's security deposits and escrow deposits under contracts of sale), bank accounts, funds, documents, contract rights, accounts, commitments, construc-

tion contracts, architectural agreements, general intangibles (including, without limitation, trademarks, trade names and symbols) and instrument notes, chattel paper arising from or by virtue of any transactions related to the Land, the Improvements or the Personal Property ... (h) all proceeds arising from or by virtue of the sale, lease, or other disposition of the Land, the Improvements and the Personal Property ... (k) all of the leases, rents, deposits, ... profits, revenues or other benefits of the Land, the Improvements or the Personal Property ... (n) the net profits realized now or at any time in the future from the operation, refinancing and/or the sale of the Land, the improvements and the Personal Property; and (o) all proceeds of the above-described property ... (R.Ex. No. 4).

3. "Gross Revenue" includes revenue received by the sale of rooms, food and beverages, telephone services, store rental, valet service, laundry and cleaning services, and other miscellaneous income, received by MHM in the operation of the Hotel. Mgt. Contract section 1(d).

deposited the total amount paid on the guest's bill into the General Operating Account in Corpus Christi, where the funds were commingled with other monies. Later, MHM made payments for these services to the individual vendors by checks drawn on the Disbursal Account in Dallas and then drafted the General Operating Account to cover these expenses.

Three $100,000 checks were written on the Disbursal Account on March 21, 1989, June 6, 1989 and August 31, 1989, at the request of Mr. G. Bickford Shaw ("Shaw"), the general partner of Corpus Christi Hotel Associates ("CCHA"), which is the general partner of the Debtor.

Shaw took the funds represented by the three checks and established three accounts at The Bank of Corpus Christi, Citizens State Bank of Corpus Christi, and MBank Corpus Christi. These accounts were titled "Certificates of Deposit" by each bank. However, the documents representing the deposit of funds in Bank of Corpus Christi state, "[T]his is a receipt for funds deposited at the Bank of Corpus Christi in a time account ... this is a non-negotiable, non-transferable deposit ... the rights you have as owner of the deposit may not be transferred or assigned without prior written consent." (M.Ex. No. 1, 22 & 23). The document was not made payable to order or bearer. Similarly, the documents representing the accounts in Citizens State Bank and MBank Corpus Christi also reflect mere time deposits, not "Certificates of Deposit." (M.Ex. No. 2, 24 & 25).

After FFB made demand for delivery of these funds, Shaw removed the funds from the banks described above and used a portion of them to establish two deposit accounts at American Bank of Corpus Christi and First National Bank of Corpus Christi in the respective amounts of $99,365.48 and $99,717.30. The remainder of the funds was paid to two law firms as retainers.

When the Debtor failed to honor FFB's demands for delivery of the accumulated proceeds from the Hotel, FFB sued the Debtor[4] in Travis County, Texas, to enforce the provisions of the Note and the assignment of rents, revenues and proceeds included in the Deed of Trust. In conjunction with this suit, FFB also filed a garnishment proceeding[5] in the same court in an attempt to attach the proceeds from the Hotel's operation, whether they were in the hands of MHM or certain financial institutions ("Garnishment Proceeding").

On the date of service, October 18, 1989, MHM was in possession of $291,823.00.

On November 7, 1989, the same day CCHP filed its Chapter 11 petition in the Southern District of Texas, MHM filed its answer to the Garnishment Proceeding in Travis County and identified $311,657.00 in funds in the General Operating Account.

Thereafter, both Travis County lawsuits were removed to this Court. CCHP has continued to operate its business as Debtor-in-Possession, with MHM continuing to operate the Hotel under the terms of the Mgt. Contract.

## DISCUSSION

The Financing Statement described in paragraph 5 above properly perfected a security interest in personal property of the Debtor in favor of FFB.

■ Pursuant to the Mgt. Contract, MHM is employed as an independent contractor of the Debtor for the day-to-day operation of the Hotel. On the other hand, MHM acts as the Debtor's agent for receiving and disbursing funds generated from the operation of the Hotel. The same contract may establish an independent contractor relationship for some purposes and an agency relationship for others. *Carruth v. Valley Ready–Mix Concrete Co.,* 221 S.W.2d 584, 592 (Tex.Civ.App.—Eastland, 1949 writ ref'd.); *Clark v. Texaco Inc.,* 382 S.W.2d 953, 958 (Tex.Civ.App.1964); *Maynard Hill, Inc. v. Smith,* 534 S.W.2d 733, 736 (Tex.Civ.App.—Waco 1976, no writ), *In*

---

4. *Franklin Federal Bancorp, a Federal Savings Bank v. Corpus Christi Hotel Partners, Ltd., et al.,* filed in the 147th Judicial District Court of Travis County, Texas.

5. *Franklin Federal Bancorp, a Federal Savings Bank v. MHM, Inc., et al.,* filed in the 147th Judicial District Court of Travis County, Texas.

*re Shulman Transport Enterprises, Inc.,* 744 F.2d 293, 294 (2nd Cir.1984). The specific language of a contract controls over its general terms. *O'Connor v. O'Connor,* 694 S.W.2d 152, 155 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.). If a contract is vested with a definite legal meaning, there is no necessity to speculate on the intention of the parties. *Anderson v. Jasper Federal Savings & Loan Association,* 738 S.W.2d 768, 770 (Tex.App.—Beaumont 1987, writ denied).

Section 7 of the Mgt. Contract unequivocally states that all funds received in the operation of the Hotel shall be funds of the OWNER, to be deposited into agency accounts, as designated by OWNER in the name of MHM, as agent and manager of the OWNER. Section 14 provides that in any action taken pursuant to this Agreement, MHM will be acting as an independent contractor for the OWNER. This Section further states: "Notwithstanding the independent contractor relationship, all debts and liabilities to third persons incurred by MHM in the reasonable course of its operation of OWNER's HOTEL shall be the debts and liabilities of the OWNER only and MHM shall not be liable for any such debts or liabilities." This language clearly shows the intent of the parties to have MHM function in a dual capacity.

Property acquired by a bankrupt estate post-petition is not subject to any lien resulting from a security agreement entered into by the debtor before the commencement of the case. 11 U.S.C. § 552(a)[6] allows the debtor to use, sell, or lease property such as new accounts receivable, in the ordinary course of business, without a court order. 11 U.S.C. § 552(b)[7] provides

an exception to this general rule by allowing that pre-petition liens in proceeds, products, offspring, rents and profits not be cut off. In the case at bar, the receipts of the collateral are clearly not offspring or products.

In Texas the term "rent" refers to the landlord/tenant relationship and not to the innkeeper/lodger relationship. The general rule is that a tenant is vested with an estate in the property while a hotel guest is not. *Mallam v. Trans–Texas Airways,* 227 S.W.2d 344, 346 (Tex.Civ.App.—El Paso 1949, no writ); *See also, In re Waco Hotel Limited Partnership,* No. 6–86–00298 (W.D.Tex. July 16, 1986) (order on room receipts). A guest in a hotel is a mere licensee, not a tenant. They have only a personal contract and acquire no interest in the realty. *In re Greater Atlantic and Pacific Inv. Group., Inc.,* 88 B.R. 356, 359 (Bankr.N.D.Okla.1988). Courts in other jurisdictions have also found that a security interest in hotel revenues is an interest in personalty, not realty. *In re Kearney Hotel Partners,* 92 B.R. 95, 99 (Bankr.S.D.N.Y.1988); *In re Sacramento Mansion, Ltd.,* 117 B.R. 592, 607 (Bankr.D.Colo.1990); *In re Mid–City Hotel Associates,* 114 B.R. 634, 641 (Bankr.D.Minn.1990); *In re Ashkenazy Enterprises, Inc.,* 94 B.R. 645, 647 (Bankr.C.D.Cal.1986).

Nor are hotel revenues profits under 11 U.S.C. § 552. *In re Investment Hotel Properties, Ltd.,* 109 B.R. 990, 996 (Bankr.D.Colo.1990).

The distinction between after-acquired property, which the secured creditor loses under § 552(a), and proceeds, which are preserved for the secured creditor pursu-

---

**6.** "(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a) 1990.

**7.** Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title [11 USCS §§ 363, 506(c), 522, 544, 545, 547 and 548], if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such

security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise. 11 U.S.C. § 552(b) 1990.

ant to § 552(b), is not always clear. 4 *Colliers on Bankruptcy*, § 552.01 at 552–5 (15th Ed.1990) states:

"Courts have wrestled to formulate a test for distinguishing between after-acquired property and proceeds, with mixed results. Some have invoked the spirit of *Local Loan Co. v. Hunt*, (citation omitted), which forbade 'the creation of an enforceable lien upon a subject not existent when the bankruptcy became effective or even arising from, or connected with preexisting property, but brought into being solely as the fruit of subsequent labor of the bankrupt', (citation omitted). Others, taking their cue from *Local Loan*, emphasize the 'fresh start' or 'rehabilitative' policy underlying section 552. Still others have employed the familiar, but no less amorphous, terminology of the Uniform Commercial Code which validates after-acquired property clauses in section 9–204 and defines proceeds in section 9–306. Even among these courts, however, there is disagreement whether the exception for proceeds in section 552(b) should be read 'narrowly', or in a non-limiting manner, consistent with dicta in the House Report. Finally, there have been variations on the themes of 'receipt', 'generation', 'conversion', and 'substitution', intended to pinpoint the timing and manner of 'acquisition' of the collateral pre-petition and its transmutation, in some fashion, into proceeds post-petition. Courts presumably will continue to formulate and refine tests for distinguishing after acquired property from proceeds as case law develops. In any event, the burden of proving that a lien survives post-petition, notwithstanding the mandate of section 552, has been placed upon the secured party."

Courts that have determined that the collateral is after-acquired property and not proceeds, and that have used § 552(a) to cut off a secured creditor's lien, include the following: *In re Texas Tri–Collar, Inc.*, 29 B.R. 724 (Bankr.W.D.La.1983) (prepetition assignment of accounts receivable is cut off by § 552(a); accounts receivable are in no way proceeds and therefore lien does not extend under § 552(b)); *In re Big Hook Land & Cattle Co.*, 81 B.R. 1001 (Bankr. D.Mont.1988) (post-petition increases in cattle herd through shares or calf crop were not subject to lien resulting from after-acquired property clause in security agreement and are therefore cut off by § 552(a)); *In re Transp. Design & Technology, Inc.*, 48 B.R. 635 (Bankr.Cal.1985) (patent issued to debtor after filing petition did not constitute proceeds of pre-petition patent, it was instead after-acquired property and operation of § 552(a) cuts off creditor's interest); *In re Hamilton*, 18 B.R. 868 (Bankr.Colo. 1982) (crops planted after petition are after-acquired property and § 552(a) cuts off lien); *see also, In re Drewes*, 68 B.R. 153 (Bankr.N.D.Iowa 1986); *In re Investment Hotel Properties, Ltd.*, 109 B.R. 990 (Bankr.D.Colo.1990) (security interest in post-petition accounts receivable pursuant to pre-petition security agreement is invalidated by § 552(a), except to the extent provided by § 552(b)).

■ Hotel revenues are not proceeds under Tex.Bus. & Com.Code § 9.306(a). Section 9.306(a) defines "proceeds" as whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. Hotel revenues are not received from the sale or collection or other disposition of the collateral or property.

Texas case law interpreting hotel revenues in light of § 9.306(a) is almost non-existent. Two unreported decisions maintain that hotel revenues are not proceeds because the law construes proceeds to involve some permanent disposition of the property, more than the mere use of the property to provide hospitality to guests. *In re Allied Texas Investments, Inc.*, No. 389–30056–SAF–11 (N.D.Tex. Oct. 16, 1989) (order denying hotel rents as cash collateral); *In re Waco Hotel Limited Partnership*, No. 6–86–00298 (W.D.Tex. July 16, 1986) (order on room receipts).

■ The legislative intent behind 11 U.S.C. § 552(b) indicates that the term "proceeds" is meant to have a much broader definition than the restrictive Uniform Commercial Code definition. *See, 4 Collier*

*on Bankr.,* § 552.01 Note 12, at 552–55 (15th Ed.1989). "The term 'proceeds' is not limited to the technical definition of that term in the UCC, but covers any property into which property subject to the security interest *is converted."* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 377 (1977), *reprinted in* U.S.Code Cong. & Admin.News 1978, pp. 5787, 6333. (Emphasis added.) The definition should not be so broad as to swallow the general rule. Limiting proceeds to property subject to the security interest which is sold, disposed of, or converted allows the creditor to maintain its interest in the new property. If proceeds included funds generated from any use of collateral, arguably all post-petition funds would become proceeds. Congress intended to extend a pre-petition lien post-petition when collateral is converted into new property.

This interpretation is consistent with *In re Cleary Bros., Const. Co., Inc.,* 9 B.R. 40, 41 (Bankr.S.D.Fla.1980) and *In re A.E.I. Corp.,* 11 B.R. 97, 101 (Bankr. E.D.Pa.1981). The court in *Cleary Bros.* found that rent paid for the temporary use of a crane under the Florida Uniform Commercial Code did not constitute proceeds. "The money sought by plaintiff was not received when the collateral was sold, exchanged or collected. The words 'otherwise disposed of' related to a permanent or final conversion, not a temporary use. Had the Sponsors intended to extend the lenders lien to include rent from the temporary use of collateral which has been given as security, they would have included the term 'leased'". *Cleary Bros.* at 41. Similarly, the court in *A.E.I. Corp.* reasoned that while the SBA's security interest extended to proceeds of the collateral, "proceeds" under applicable Pennsylvania law did not include rental payments when the security interest did not cover the lease of the collateral.

■ A number of courts have found that revenues from hotel guests are pro-

ceeds of accounts. *In re Ashkenazy Enterprises, Inc.,* 94 B.R. 645, 647 (Bankr. C.D.Cal.1986) (hotel revenues are proceeds of accounts under Cal.Comm.Code § 9.106); *See In re Blue Ridge Motel Associates,* 106 B.R. 81, 82 (Bankr.W.D.Pa.1989) (motel room proceeds clearly fall within the description of an account); *Cf. In re M. Vickers, Ltd.,* 111 B.R. 332, 333–36 (D.Colo. 1990) (motel "profits" are accounts under Colo. law); *In re Investment Hotel Properties Ltd.,* 109 B.R. 990, 995 (Bankr. D.Colo.1990) (payment on room revenue accounts receivable is proceeds). Any revenues from hotel customers which were owed on the date of filing would be accounts receivable and subject to FFB's security interest. Further, the payment of those accounts post-petition would constitute "proceeds". Similarly, funds in the General Operating Account on the date of filing are subject to FFB's lien. All post-petition receipts on account of post-petition operations of the Hotel are cut off by 11 U.S.C. 552(a).

■ The funds titled "Certificates of Deposit" consist of three (3) $100,000.00 checks written off the Disbursal Account in Dallas. Before the funds were removed, they were subject to FFB's perfected security interest. By attempting to establish certificates of deposit ("CDs") at the three banks, the Debtor claims that the funds became non-cash proceeds since the only possibility for including CDs under the defined term of "cash proceeds" is the residual clause "and the like" contained in § 9.306(a)[8]. This phrase was held specifically not to include certificates of deposit. *Citicorp (U.S.A.) Inc. v. Davidson Lumber Co.,* 718 F.2d 1030, 1032 (11th Cir.1983). The Debtor asserts that FFB does not possess a perfected security interest in these funds because they were channeled through CDs and therefore no longer constitute "cash proceeds" under § 9.306(a). CDs are instruments a creditor must take possession of to perfect, or lose its lien on the funds as a result of the failure to take

---

**8.** "Proceeds" includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds.... (M)oney, checks, deposit accounts and the like are "cash proceeds". All other proceeds are "non-cash proceeds". Tex.Bus. & Com.Code Ann. § 9.306(a) (Vernon 1990).

possession. *Citicorp (U.S.A.) Inc. v. Davidson Lumber Co.*, 718 F.2d at 1032. If these accounts were true CD's, then the Debtor's reliance on this case might be justified. However, a review of the exhibits proves that the documents are not true CDs, but mere deposit accounts.[9]

Under Tex.Bus. & Com.Code § 3.104, a certificate of deposit is an instrument which is an acknowledgment by a bank of the receipt of money with an engagement to repay it. It may be either negotiable or non-negotiable. But it must be a writing which evidences a right to the payment of money which is of the type which is transferred by delivery with the appropriate endorsement or assignment.[10]

Therefore, the funds represented by the three $100,000 checks placed in the Bank of Corpus Christi, Citizens State Bank and MBank Corpus Christi, in accounts titled "Certificates of Deposit", were not certificates of deposit as defined by the Tex.Bus. & Com.Code § 3.104 and thus are subject to FFB's financing statement.

The extent to which any pre-petition receipts are subject to FFB's lien is controlled by Tex.Bus. & Com.Code § 9.306(d). Since all receipts of the debtor were placed in one general account, hotel receipts have been commingled with receipts in which the debtor had no interest such as tax receipts, tips, etc. Subparagraph 4 states that in the event of insolvency, the security interest shall be valid in all cash and accounts of the debtor in which receipts have been commingled with other funds subject to any set-off. No evidence was adduced at the hearing as to what set-offs the debtor may be entitled. Should the parties be unable to agree on the appropriate set-offs, then a further hearing must be held on that issue.

## CONCLUSION

The pre-petition funds of the debtor represented by the amount in the general operating account on the filing date and the three time deposits labeled "Certificates of Deposits" are subject to FFB's lien subject to any set-off. The funds generated by post-petition operation of the hotel are cut off by 11 U.S.C. § 552(a) and not subject to FFB's lien.

Attorneys for Corpus Christi Hotel Partners, Ltd., shall provide an order consistent with these findings within ten (10) days.

---

9. "Deposit Account" means a demand, time, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a certificate of deposit. Tex.Bus. & Com.Code Ann. § 9.105(a)(5) (Vernon 1990).

10. Tex.Bus. & Com.Code Ann. § 9.105(a)(9) (Vernon 1990).