# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00330-CV

**Robert Trotter Gift Fund for Thomas U/A/D 5-3-81, a/k/a Robert Trotter Gift Trust for Thomas U/A/D 5-3-82, and Thomas S. Trotter, Appellants**

**v.**

**Trinity Universal Insurance Company, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
## NO. GN304871, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal arises from an insurance coverage dispute under a Commercial General Liability (CGL) policy. After he was sued by several lot owners in a subdivision he had developed, appellant Thomas S. Trotter, who had acted through the Robert Trotter Gift Fund for Thomas U/A/D 5-3-81 (collectively, "Trotter"), requested a defense and indemnity under his CGL policy with Trinity Universal Insurance Company. Trinity declined, in the view that "the plaintiff does not seek to recover damages for Bodily Injury or Property Damage caused by an occurrence or Personal Injury or Advertising Injury caused by an offense as defined." Trotter ultimately incurred liability and litigation expenses in this underlying lawsuit.[1] Trotter sued Trinity, asserting that the

---

[1] *See Haug v. Carter*, No. 03-03-00476-CV, 2004 Tex. App. LEXIS 6817, at *31 (Tex. App.—Austin July 29, 2004, pet. denied) (mem. op.) (affirming the district court's judgment for the plaintiffs).

carrier breached the insurance contract by refusing to defend and indemnify him and that Trinity's failure to defend him violated the insurance code. Trotter sought actual damages, additional damages, and attorney's fees. Trinity counterclaimed for declaratory judgment that it had no duty to defend Trotter under the CGL policy and for attorney's fees. On cross-motions for summary judgment, the district court granted Trinity's motion, denied Trotter's, and rendered judgment that Trotter take nothing.

Trotter appeals, bringing five issues challenging (1) the district court's summary judgment on Trinity's declaratory claim that the carrier had no duty to defend Trotter; and (2) the court's denial of summary judgment on Trotter's claims that Trinity (3) breached the CGL policy contract by failing to defend him, (4) violated the insurance code, and (5) breached the policy contract by failing to indemnify him. For the reasons explained below, we affirm the district court's judgment.

We review the district court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 291 (Tex. 2004) (citing *Knott*, 128 S.W.3d at 215-16). Where, as here, both parties move for summary judgment and the district court grants one motion and denies the other, we should review the summary-judgment evidence presented by both sides, determine all questions presented, and render the judgment the district court should have rendered. *Texas Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004);

2

*FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). We must affirm the summary judgment if any of the summary-judgment grounds are meritorious. *Patient Advocates*, 136 S.W.3d at 648; *FM Props.*, 22 S.W.3d at 872.

The central question in this appeal is whether, as a matter of law, Trinity had a duty under the CGL policy to defend Trotter against the underlying suit. To determine whether Trinity had a duty to defend Trotter, we look to the "eight corners" of the petition in the underlying suit and the insurance policy (the "four corners" of each instrument), comparing the facts alleged in the petition with the policy language to determine whether the petition alleges acts within the policy's scope of coverage. *See Allstate Ins. Co. v. Hallman*, 159 S.W.3d 640, 643 (Tex. 2005); *National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997). When applying this rule, we are to focus on the factual allegations that show the origins of the alleged damages rather than on the legal theories pleaded, give a liberal interpretation to the factual allegations, and resolve doubts in favor of coverage. *Hallman*, 159 S.W.3d at 643; *Merchants Fast Motor Lines, Inc.*, 939 S.W.2d at 141. Where the petition does not state facts sufficient to clearly bring the case within or without the policy's coverage, the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy. *Merchants Fast Motor Lines, Inc.*, 939 S.W.2d at 141 (quoting *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.*, 387 S.W.2d 22, 26 (Tex. 1965)). Further, we are not concerned with the truth or falsity of the pleadings. *See Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821 (Tex. 1997) (duty to defend is triggered solely by factual pleadings and language of policies, without regard to truth or falsity of pleadings). If an insurer owes a duty to defend any of the claims against

3

its insured, that duty extends to the entire suit. *See Utica Nat'l Ins. Co. v. American Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004); *CU Lloyd's v. Main St. Homes, Inc.*, 79 S.W.3d 687, 692 (Tex. App.—Austin 2002, no pet.).

We begin our analysis by reviewing the factual allegations in the underlying lawsuit. *See Cowan*, 945 S.W.2d at 821. The plaintiffs were a group of individuals who had purchased lots in the Thurman Bend Estates subdivision on Lake Travis (the "underlying plaintiffs"). The defendants included Trotter, the developer of Thurman Bend Estates. The underlying plaintiffs alleged that:

> At various times beginning in 1994 through 1996, Plaintiffs solicited information about Thurman Bend Estates . . . . Defendants . . . represented to Plaintiffs that a one-acre homeowners' lakeside park would be conveyed by [Trotter] to the Thurman Bend Owners' Association for the benefit of all of the owners of lots in Thurman Bend Estates. It was represented that the park could have facilities consistent with those found in other lakeside parks, including, but not limited to, boat trailer and automobile parking, recreational areas, barbeque pit(s), picnic facilities, a boat launch and space to build a boat dock and/or swim platform. Plaintiffs were led to believe that a true park for the benefit of Thurman Bend lot owners would be conveyed by Defendant Trust.

"Substantiating this representation," the underlying plaintiffs added, "a Declaration of Covenants, Conditions, and Restrictions for Thurman Bend Estates Subdivision ("Declaration") was signed and filed by Defendant Trotter . . . in July, 1995, which represented that [Trotter] would convey to the Thurman Bend Owners' Assn. a 'lake side park area easement and an access easement for the usage by all Owners.'"

The underlying plaintiffs further alleged that "[b]ased upon and in reliance upon these representations, in 1994 through 1996, Plaintiffs paid substantial amounts of money to purchase lots

in Thurman Bend Estates . . . ." However, the underlying plaintiffs pled, Trotter and the other defendants ultimately failed to provide the represented easement. They alleged that defendants "failed to disclose the true nature of the 'park'" and that "[t]his failure to disclose and false representations were very material facts which induced Plaintiffs to agree to purchase their Thurman Bend lots."

Specifically, the underlying plaintiffs elaborated, Trotter "sold Lot Number 18 to Defendant [Robert L.] Haug in February 1996" and "signed a Grant of Easements dated February 26, 1996 . . . to Thurman Bend Estates Owners' Association for the benefit of all of the [lot] owners" on Lot 18. The easement, whose terms were negotiated "without any input or knowledge of the current Thurman Bend Estates property owners," "created a 'Boat Launch Easement' which could be used 'only for ingress and egress from Lake Travis.'" Further, the grant of easement prohibited "'[a]ctivities of extended duration'" within the areas of the easement outside of a 20-foot strip. "The twenty (20) foot easement strip is land reserved by the Lower Colorado River Authority for the rise and fall of Lake Travis" that "is on a relatively severe incline with a very rocky surface making it unsuitable for most recreational activities."

The underlying plaintiffs added that, "Prior to July, 1998, the Plaintiffs not knowing about the 'Boat Launch Easement' used the property as a park, [with] such activities as, parking vehicles and boat trailers, recreating and picnicking." In July 1998, at the first meeting of the Thurman Bend Owners' Association, Haug "stated that the easement was solely for ingress and egress," but "those Plaintiffs that heard him thought that he was referring to the access easement only, not the park easement." However, "on April 5, 2000, it was made clear when Defendant Haug

5

sent a letter to all Thurman Bend lot owners" explicitly prohibiting "'parking, fishing, picnicking, loitering, camping, including fires, [or] swimming'" on his lot, and that, "because the easement did not allow doing anything of extended duration, unattended vehicles would be towed." At this juncture, "Plaintiffs learned for the first time that the park which had been previously represented was in fact merely an easement to launch a boat. There was no park." They added that, "Needless to say, the Plaintiffs wondered what happened to the one-acre homeowners' park that was represented by Defendants . . . ."

The underlying plaintiffs alleged, under the heading of "Actionable Conduct,"

> Defendants' representations concerning the nature of the "park" and their failure to disclose and false explanations were very material facts which induced Plaintiffs to purchase their Thurman Bend lots. Had the true nature of the Boat Launch Easement "park" been fully disclosed, Plaintiffs would not have purchased the lots.

The plaintiffs pled causes of action for DTPA violations (based on misrepresentations, failure to disclose, and unconscionability), breach of the sales contract, breach of the Declarations, statutory and common-law fraud, negligent misrepresentation, tortious interference, and civil conspiracy. The plaintiffs also pled that the defendants were equitably estopped from prohibiting the use of Lot 18 as a park and also sought a declaration construing the Declarations to permit certain recreational activities on Lot 18. Finally, the plaintiffs sought reformation of the grant of easement based on mutual or unilateral mistake. The plaintiffs sought unspecified actual damages, additional damages, and the declaratory and equitable relief already noted.

6

The Thurman Bend Owners' Association intervened as plaintiffs, citing "the same basis as the Plaintiffs' suit." It sought relief including reformation of the Declarations and grant of easement or, in the alternative, monetary damages.

We now compare the underlying plaintiffs' factual allegations to the CGL policy provisions. Trotter contends that the pleadings invoked a duty to defend under both Coverage A and Coverage B of the policy.

Coverage A, Bodily Injury and Property Damage Liability, provides that Trinity "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. [Trinity] will have the right and duty to defend any 'suit' seeking those damages. . . ." However, Coverage A also provides: "This insurance applies to 'bodily injury' or 'property damage' only if the 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory.'" "Property damage" is defined in the policy as either "[p]hysical injury to tangible property, including all resulting loss of use of that property," or "[l]oss of use of tangible property that is not physically injured." "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

Trotter argues that the underlying plaintiffs alleged a "loss of use of tangible property that is not physically injured"—specifically, the plaintiffs' inability to use Lot 18 (indisputably a piece of "tangible property") as a lakeside park.[2] Trotter first relies on the underlying plaintiffs'

_____

[2] Trotter does not assert that the underlying plaintiffs alleged either "bodily injury" or "physical injury to tangible property, including all resulting loss of use of that property" under Coverage A.

7

allegations that the defendants "represented to Plaintiffs that a one-acre homeowners' lakeside park would be conveyed" consistent with prior representations or understandings, yet the grant of easement ultimately conveyed only a twenty-foot rocky strip, and "the Plaintiffs wondered what happened to the one-acre homeowners' park that was represented by Defendants." Trinity responds that while Lot 18 is "tangible property"—property "capable of being handled or touched" or that "may be seen, weighed, measured, and estimated by the physical senses," *see Lay v. Aetna Ins. Co.*, 599 S.W.2d 684, 686 (Tex. Civ. App.—Austin 1980, writ ref'd n.r.e.)—the underlying plaintiffs alleged only that Trotter *failed* to grant them the promised right to use Lot 18, not a loss of use of that property.

We agree with Trinity. "*Loss* of use of tangible property" in the policy plainly contemplates some preexisting interest in using the "tangible property" (here, Lot 18) whose deprivation would constitute "loss of use." The underlying plaintiffs alleged instead that the defendants' actions caused the *absence* of such an interest. Without an interest in Lot 18 that would allow the underlying plaintiffs to use it, the underlying plaintiffs necessarily could not state a claim for the loss of that use.

Trotter also argues that the underlying plaintiffs stated a "loss of use" of Lot 18 through their allegations that, "Prior to July 1998, the Plaintiffs not knowing about the 'Boat Launch Easement' used the property as a park, [with] such activities as parking vehicles, and boat trailers, recreating and picnicking," but that "on April 5, 2000, it was made clear when Defendant Haug sent a letter to all Thurman Bend lot owners" explicitly prohibiting "parking, fishing, picnicking, loitering, camping, including fires, swimming," and that unattended vehicles would be towed. In

other words, as Trotter puts it, "[t]he plaintiffs alleged they were using the property as a park and for parking, among other things, and then they could no longer use the property for picnicking, parking vehicles, and other activities—i.e., they lost the use of that property."

Trinity counters that even if such prior use is assumed to have been by permission, license, or "that the Underlying Plaintiffs somehow possessed an easement to use Lot 18 as a lakeside park," the deprivation of these sorts of non-possessory interests would not constitute a "loss of use of tangible property." Pointing to decisions from other jurisdictions, Trinity urges that "loss of use of tangible property" contemplates a possessory rather than intangible interest in that property. *See Kazi v. State Farm Fire & Cas. Co.*, 15 P.3d 223, 229 (Cal. 2001); *cf. Mid-Continent Cas. Co. v. Camaley Energy Co.*, 364 F. Supp.2d 600, 606 (N.D. Tex. 2005) (allegations of constructive evictions from leaseholds stated claim for "loss of use of tangible property"). In sum, Trinity argues that the "alleged impairment of a license [or easement] to use non-owned property for recreational purposes evidences a connection to the property that is simply too tenuous to constitute loss of use of *tangible* property."

Trotter replies that under the plain language of the CGL policy, the "loss of use of tangible property" is not limited to possessory interests. He emphasizes that the "eight corners rule" does not permit courts to read language into policies that is simply not there. *See Gehan Homes, Ltd. v. Employers Mut. Cas. Co.*, 146 S.W.3d 833, 843 (Tex. App.—Dallas 2004, pet. filed).

We agree with Trinity that these allegations did not state a covered claim for loss of use of tangible property. Whatever rights the underlying plaintiffs conceivably alleged they obtained in Lot 18 through prior usage, their alleged subsequent "loss of use" was caused by conduct that is

9

not an "occurrence" under the policy. The "loss of use" on which Trotter relies here was caused, according to the pleadings, by Haug's actions in April 2000, "sen[ding] a letter to all Thurman Bend lot owners" explicitly prohibiting "parking, fishing, picnicking, loitering, camping, including fires, [or] swimming" on his lot, and stating that, "because the easement did not allow doing anything of extended duration, unattended vehicles would be towed." An "occurrence" under the policy, by contrast, is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Accident" is not defined in the policy, but the supreme court has held that

> an injury is accidental "if from the viewpoint of the insured, [it is] not the natural and probable consequence of the action or occurrence which produced the injury; or in other words, if the injury could not reasonably be anticipated by the insured, or would not ordinarily follow from the action or occurrence which caused the injury."

*Mid-Century Ins. Co. v. Lindsey*, 997 S.W.2d 153, 155 (Tex. 1999) (quoting *Republic Nat'l Life Ins. Co. v. Heyward*, 536 S.W.2d 549, 557 (Tex. 1976)). "[B]oth the actor's intent and the reasonably foreseeable effect of his conduct bear on the determinations of whether an occurrence is accidental." *Id*. The allegation that Haug deliberately sent this letter to enforce his rights relative to the actual easement is not susceptible to being construed as an "accident."

We hold that the underlying plaintiffs did not allege a "loss of use of tangible property" caused by an "occurrence" within Coverage A. We express no opinion regarding other issues briefed by the parties concerning the scope and meaning of "loss of use of tangible property" or "occurrence" and the application of these terms to the underlying pleadings.[3]

---

[3] Among other contested issues, the parties dispute the extent to which this Court should consider our judgment and opinion in the underlying suit when resolving the coverage issue.

10

Trotter also argues that the underlying pleadings allege claims within Coverage B of the CGL policy. Coverage B, "Personal and Advertising Injury Liability," provides:

> [Trinity] will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. [Trinity] will have the right and duty to defend any "suit" seeking those damages.

The policy defines "personal injury," in relevant part, as "[t]he wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord, or lessor." Trotter argues that the claims asserted against him were potentially covered as an "invasion of the right of private occupancy of . . . premises." He relies again on the allegations that the plaintiffs had begun to use Lot 18 as a park and that their access to the property was later restricted.

---

*See Haug,* 2004 Tex. App. LEXIS 6817. This Court affirmed the district court's judgment reforming the grant of easement to provide a "Lake Side Park Area Easement" in which activities such as "picnicking, swimming, sunbathing, [and] fishing" were expressly permitted. *Id*. The district court based its judgment on findings of unilateral mistake by Trotter's attorney coupled with Haug's fraud and mutual mistake. *Id.* at *8-9. When rejecting Haug's sufficiency challenge to these findings, this Court reached only the unilateral mistake issue. *Id*. at *18-19.

Trinity objects to any consideration of *Haug* in our determination of whether it had a duty to defend Trotter, emphasizing that our scope of review is limited to the pleadings. Trotter responds that "[t]he underlying outcome is not cited as extrinsic evidence to show the claim was covered [but] . . . to show that the pleading in the case below—i.e., four of the eight corners—was broad enough to allow evidence of a covered claim"—specifically, mistake. Ultimately, for the reasons we explain above, *Haug* and the question of whether the underlying plaintiffs pled a mistake that constituted a covered "occurrence" have no bearing on the decisive issues in our coverage analysis.

Trinity responds that the underlying plaintiffs did not allege any "right of private occupancy" in Lot 18 that could have been "invaded." It adds that the term "right of private occupancy" in the "personal injury" definition has been held by Texas courts to refer to the rights "associated with an individual's acts of inhabiting the premises, and not to the rights associated with the individual's rights to use and enjoy the inhabited premises." *See Decorative Ctr. of Houston v. Employers Cas. Co.*, 833 S.W.2d 257, 261 (Tex. App.—Corpus Christi 1992, writ denied). The Corpus Christi court also held that coverage for any "'other invasion of the right of private occupancy' does not apply outside the landlord-tenant scenario, or when the occupier has a vested interest in the occupancy of the premises." *Id.* at 263. It reasoned that, under *ejusdem generis* principles, the policy's reference to "other right of private occupancy" was immediately preceded by "wrongful eviction" and "wrongful entry," and must have been intended to encompass actions of the same general type or refer to an similar invasion of interests. *Id.* at 261-62. *See also id.* at 261 n.4 (collecting cases).

Trotter attempts to distinguish *Decorative Center of Houston* and similar cases on the basis that the policies at issue defined "personal injury" as "wrongful eviction from, wrongful entry into, or *other* invasion of the right of private occupancy of a room, dwelling or premises," while his CGL policy with Trinity omitted the word "other." Some courts have deemed that distinction significant. *See New Castle County v. National Union Fire Ins. Co.*, 243 F.3d 744, 751-53 (3d Cir. 2001) (holding, in a case involving claims arising from zoning and permitting decisions, that "invasion of the right of private occupancy" under policy with similar language was ambiguous). On the other hand, a Texas federal court rejected a similar argument in a suit involving claims by

12

a hotel tenant against the hotel owner, "finding the slight difference in the wording of the two policies has no practical effect." *Patel v. Northfield Ins. Co.*, 940 F. Supp. 995, 1000 (N.D. Tex. 1996). Relying on *Decorative Center of Houston*, the *Patel* court held that "[w]ithout a landlord-tenant relationship or vested property right, there is no duty to defend for an 'invasion of the right of private occupancy.'" *Id.* at 1002 ("in this case there was no interference with the rights of private occupancy" by a third party's sexual assault of a hotel guest, but instead "interference with the right to *use and enjoy* the property").

We conclude that any property interest alleged by the underlying plaintiffs is not one whose alleged infringement would constitute an "invasion of the right of private occupancy." Trotter does not direct us to any case holding that an easement constitutes a "right of private occupancy" whose "invasion" gives rise to a covered claim under a CGL policy, and the sole cases nationwide of which we are aware have held to the contrary. *Liberty Mut. Ins. Co. v. East Cent. Okla. Elec. Coop.*, 97 F.3d 383, 390-91 (10th Cir. 1996); *see also Evergrow Indus. Co., Inc. v. The Travelers Ins. Co.*, 37 Fed. Appx. 300, 301-02 (9th Cir. 2002). We are persuaded that this is the correct conclusion under Texas law as well. The CGL policy's reference to "invasion of right of private occupancy" is immediately preceded by references to wrongful eviction and wrongful entry. Under the contract construction principles of *ejusdem generis*, this would ordinarily imply intent to limit the scope of the following term—"invasion of right of private occupancy"—to the same general type or nature as wrongful eviction and wrongful entry. *Decorative Ctr. of Houston*, 833 S.W.2d at 261-62. Without exhaustively addressing the precise parameters of a CGL policy's "right of private occupancy" under Texas law, we conclude that the claimed nonpossessory interests made the basis

of the underlying suit are so clearly distinguishable from the general type or nature of property interests implicated by wrongful eviction or wrongful entry that their alleged infringement could not potentially be a covered "invasion of right of private occupancy." *Patel*, 940 F. Supp. at 1002; *see also East Cent. Okla. Elec. Coop.*, 97 F.3d at 390-91.

We conclude that Trinity did not have a duty to defend Trotter. As this holding is decisive of all of Trotter's issues, we overrule them.[4]

---

[4] In his fifth issue, Trotter suggests that the fact findings in the underlying suit may implicate Trinity's duty to indemnify him even if it had no duty to defend. *See Utica Nat'l Ins. Co. v. American Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004) (duty to indemnify for losses covered under a policy is separate and distinct from the duty to defend); *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821-22 (Tex. 1997) (in contrast to the duty to defend, whose existence is controlled by whether the pleaded factual allegations, liberally construed, potentially assert a covered claim, the existence of a duty to indemnify depends upon the true facts underlying a claim); *but see GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 310 (Tex. 2006) (noting that the duty to defend under a CGL policy is often defined more broadly than the duty to indemnify); *State Farm Lloyds v. C.M.W.*, 53 S.W.3d 877, 889 (Tex. App.—Dallas 2001, pet. denied) ("The duty to defend is broader than the duty to indemnify, and where there is no duty to defend under the terms of the policy, there can be no duty to indemnify."). Trotter cites the following findings:

- Trotter represented orally and in writing that the Thurman Bend Estates lot owners would have the use of a park on Lake Travis.
- Trotter intended the Grant of Easement for Lot 18 would include a lakeside park.
- The Grant of Easement for Lot 18 failed to set forth the intentions of Trotter.
- The failure of the Grant of Easement to set forth the full agreement was a mutual mistake by all the parties. Alternatively, the failure to set forth the full agreement regarding the park was a unilateral mistake by Trotter.
- Trotter was liable for 25% of the plaintiffs' attorneys' fees, based on his contributory fault.

None of these findings could give rise to a duty to indemnify where, as we have determined, the underlying plaintiffs did not allege a "loss of use of tangible property." We overrule Trotter's fifth issue.

**CONCLUSION**

Having overruled Trotter's issues on appeal, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed:    September 13, 2007